IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| KIMBERLY K. ROSS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 02-1173-CV-W-SWH |
| ) | |
| SIOUX CHIEF MFG. CO., INC., and ) | |
| CHIEFTAIN CORPORATION, ) | |
| ) | |
| Defendants. ) | |

ORDER

Plaintiff brought this action against defendants Sioux Chief Manufacturing Company, Inc. ("Sioux Chief") and Chieftain Corporation ("Chieftain") alleging retaliation for reassigning plaintiff to an Employee Advocate position in September 2001 and then terminating her from her employment in January 2002 in violation of Title VII and the Missouri Human Rights Act ("MHRA") (Count 1), a violation of the Missouri Service Letter Statute, R.S.Mo. § 290.140 (Count 3), and a breach of an express written contract (Count 2).

Pending before the Court is Defendants' Motion for Summary Judgment (doc. #44) seeking summary judgment on all of plaintiff's claims. In her opposition to the motion, plaintiff "voluntarily dismisses with prejudice and or abandons her claim in Count 2 ..." (Plaintiff's Suggestions in Opposition to Defendants' Motion for Summary Judgment (doc. #49) at 1) Further, plaintiff states she is no longer challenging her reassignment to the Employee Advocate position in September 2001 as an act of retaliation. (Id. at 23) Therefore, the Court will consider defendants' motion for summary judgment as to plaintiff's claim of retaliation with respect to her termination in January 2002 and as to the alleged violation of the Missouri Service Letter Statute.

I.  STANDARDS FOR EVALUATING A MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is granted when the pleadings and evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  The burden is on the moving party to show the absence of evidence to support the nonmoving party's case.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The nonmoving party may not rest upon allegations or general denials, but must come forward with specific facts to prove that a genuine issue for trial exists.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 243 (1986).  In doing so, all evidence and inferences therefrom are viewed in the light most favorable to the nonmoving party.  See Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

II.  MATERIAL FACTS

The following facts are deemed uncontroverted, unless otherwise noted by the Court, for purposes of Defendants' Motion for Summary Judgment:

1. Sioux Chief Manufacturing is a producer and distributor of plumbing supplies and equipment.  (Defendant's Statement of Facts ("SOF") #1)

2. Sioux Chief is headquartered in Peculiar, Missouri, and is owned and managed at the executive level by members of the Ismert family.  Specifically, Joseph Ismert ("Joe Ismert") is the President and Dominic Ismert is the Chief Financial Officer ("CFO").  Dominic Ismert is Joe Ismert's son.  (SOF #2)

3. Prior to January 2002, Joe and his brother, Martin Ismert ("Mike Ismert"), managed Sioux Chief.  Joe Ismert held the title of Vice President and Mike held the title of Chief Executive Officer ("CEO").  (SOF #3)

4. Chieftain was the former parent company of Sioux Chief.  In April 2003, Chieftain dissolved and merged into Sioux Chief.  During its existence, Chieftain was a holding company, which did not employ any individuals.  (SOF #4)

5. Plaintiff began her employment at Sioux Chief as a Sales and Marketing Assistant on February 15, 1993.  (SOF #5)

6. In or around 1996, plaintiff became a Human Resources Assistant and began

2

Case 4:02-cv-01173-SWH   Document 69   Filed 09/07/05   Page 2 of 20

reporting to Derinda Pearman ("Pearman"), Human Resources Manager. (SOF #13)

7. In early 1998, Pearman resigned her employment at Sioux Chief and Ron Berg ("Berg") became the Human Resources Manager and began supervising plaintiff. (SOF #14)

8. In early May 2000, Joe and Mike Ismert terminated Berg's employment for performance related reasons. (SOF #15)

9. When she learned of Berg's termination on or about May 8, 2000, plaintiff advised Joe and Mike Ismert, for the first time, that Berg had sexually harassed her. Specifically, Ross reported that "Berg liked to drive [her] to seminars so he could run his hand up [her] leg and thigh and that he could run his hand over [her] breast." (SOF #16)

Plaintiff does not controvert that she had not advised Joe and Mike Ismert of the harassment until this time. Plaintiff, however, contends she previously advised Sharon Wells, Berg's assistant in Human Resources about Berg's sexual harassment. Plaintiff claims that although Wells was designated in the company's sexual harassment policy as being the EEO Counselor to whom employees could internally report sexual harassment complaints, Wells did nothing about the complaint. Wells told plaintiff to "grow up" and "see the big picture" and that Berg reported to Mike Ismert and was only doing what Mike Ismert wanted and told him to do. (See Plaintiff's Statement of Facts ("PSOF") #15 and #16)

10. As a result of her complaint against Berg, Mike Ismert offered plaintiff counseling, which would be paid by Sioux Chief. According to Mike Ismert, he offered plaintiff counseling so that "she could get past the incident." Plaintiff declined Mike Ismert's offer for counseling. (SOF #17)

11. After they terminated Berg, Mike and Joe Ismert made the decision to promote plaintiff to the Human Resources Manager position. (SOF #18)

12. Several days after Berg's termination, plaintiff alleges that she and Mike Ismert had a private discussion at the pond located on Sioux Chief's property and that Mike Ismert advised her that she was being promoted to the position of Human Resources Manager. Plaintiff further alleges that Mike Ismert promised her that he would supervise her as long as she remained employed by Sioux Chief. (SOF #19)

13. As of August 2001, Mike Ismert had made the decision to leave Sioux Chief in the fall of 2001. Mike Ismert's intention was to continue to work in sales, "tie up loose ends," and eventually "fade out." (SOF #22)

14. On August 6, 2001, Dominic Ismert began working at Sioux Chief as CFO. (SOF

3

#23)

15. Plaintiff first learned of Dominic Ismert's employment at Sioux Chief when Dominic Ismert reported to work on August 6, 2001, and announced that he would be managing the Human Resources, Purchasing, Planning and MIS Departments. On this date, plaintiff learned that Dominic Ismert would be supervising her employment. (SOF #24)

16. Dominic Ismert's first project as Sioux Chief's new CFO was to undertake an analysis and evaluation regarding the efficiency and effectiveness of Sioux Chief's administrative and financial departments, including the Human Resources, Purchasing, Planning, and MIS Departments. (SOF #26)

17. During Dominic Ismert's evaluation of the Human Resources Department, plaintiff ordered Annette Hitchner ("Hitchner") and Teresa Wolfe ("Wolfe"), two employees supervised by her, to be uncooperative with Dominic Ismert and specifically to withhold and/or refuse to provide Dominic Ismert information. At some point during Dominic Ismert's evaluation, Hitchner and Wolfe discovered that plaintiff had moved various computer files, which they believed was done for the purpose of hiding files from Dominic Ismert. (SOF #27)

    Plaintiff denies that she told Hitchner and Wolfe to be uncooperative or to withhold and/or refuse to provide information or documents to Dominic Ismert. Plaintiff also denies that she moved or deleted any computer files or hid files from Dominic Ismert. (PSOF # 29)

18. Upon completion of his evaluation, Dominic Ismert concluded that the Human Resources Department was performing at unacceptable levels of efficiency and effectiveness. It was Dominic Ismert's belief that the Human Resources Department was "just a mess, a pile of orderlessness." (SOF #28)

19. Dominic Ismert observed plaintiff's office to be in disarray and also observed that she was not effectively performing her job duties as the Human Resources Manager. (SOF #29)

20. Dominic Ismert received numerous complaints from Sioux Chief employees as well as the Company's vendors and/or potential vendors about plaintiff's performance and negative attitude. (SOF #30)

21. After observing her performance, Dominic Ismert made the decision to restructure the Human Resources Department and specifically to remove plaintiff from the Human Resources Manager position and transfer her to a new position entitled "Employee Advocate." (SOF #31)

4

22. On Friday, September 21, 2001, Joe, Mike and Dominic Ismert met with plaintiff and advised her that the Human Resources Department had been reorganized, that she was being removed as the Human Resources Manager, that she would be transferred into the Employee Advocate position, and that Hitchner would be promoted to Human Resources Manager. (SOF #32)

23. Joe, Mike and Dominic Ismert further advised plaintiff in the September 21, 2001 meeting that if she was interested in another position within the Company to let them know, and they would consider her for the position. The decision to remove plaintiff from the Human Resources Manager position, however, was final. Plaintiff failed to provide an alternative plan. (SOF #33)

24. Mike Ismert was unable to recall the September 21, 2001 meeting with plaintiff. After the terrorist attacks on September 11, 2001, Mike Ismert spent a majority of his time on the road meeting customers and trying to maintain sales. As such, he was not involved in the day-to-day operations of Sioux Chief. (SOF #34)

25. On September 24, 2001, plaintiff updated her resume and shared it with a subordinate employee, Jessica Johnson ("Johnson"). (SOF #42)

    Plaintiff contends she did not intend to leave her employment with defendants at that time and was not looking for another job. Plaintiff claims that throughout her employment with defendants she had kept her resume updated and had previously obtained letters of recommendation or reference from various managers with whom she had worked. (PSOF #36)

26. After learning of her transfer to the Employee Advocate position, plaintiff began shredding documents in her office. Dominic Ismert felt it was inappropriate for her to be shredding documents in a time of transition and instructed her to stop. Plaintiff initially stopped shredding documents, but ultimately resumed shredding. Once again, Dominic Ismert instructed her to stop shredding documents, but plaintiff disregarded the request and continued to shred documents. Consequently, Dominic Ismert unplugged the shredding machine and removed it and some of the shredded documents from plaintiff's office. (SOF #43 through #47)

    Plaintiff disputes defendants' recitation of this event. Plaintiff claims she began cleaning and organizing her office because Dominic Ismert had told her to do so. As a part of the cleaning process, plaintiff was shredding unnecessary documents which had been stacked in her office. Plaintiff denied that she shred any documents from her or any other employee's personnel file. At one time, Dominic Ismert opened the door to plaintiff's office, walked in and asked what she was doing. Plaintiff stated that she was cleaning her office as he had instructed her to do. Plaintiff claims Dominic Ismert immediately unplugged and removed the shredding machine from plaintiff's office without further discussion. Dominic Ismert also took a stack of

5

papers that plaintiff had in her hand and the bag of shredded paper from plaintiff's office. (PSOF #37 through #42)

27. Joe Ismert thereafter questioned plaintiff about the incident. Even though she admitted to shredding documents, plaintiff denied shredding any relevant business documents. (SOF #48)

28. On September 25, 2001, plaintiff sent Joe, Mike and Dominic Ismert a memorandum and advised that she was confused by her removal as the Human Resources Manager. Although plaintiff acknowledged that various individuals had complained about her, she denied any responsibility for these complaints. According to plaintiff, all of the individuals who complained about her had their own personal motives to do so. (SOF #36)

29. Plaintiff acknowledged in her deposition that the Employee Advocate position had meaningful duties and responsibilities. (SOF #37)

30. On or about October 1, 2001, Dominic Ismert provided plaintiff a memorandum, which defined the new job duties and responsibilities of the Human Resources Manager, Employee Advocate and Human Resources Assistant. (SOF #38)

31. At first, Dominic Ismert did not intend to move plaintiff into a new office. However, Dominic changed his mind after Hitchner requested that she and Wolfe be moved to a different office due to plaintiff's hostile and combative attitude towards them as well as other employees who visited the Human Resources office. Instead of moving Hitchner and Wolfe, Dominic Ismert moved plaintiff to another office, which happened to be Berg's old office. (SOF #39)

32. Dominic Ismert did not have any knowledge that he had transferred plaintiff into Berg's old office. (SOF #40)

    Plaintiff claims that prior to making the decision to move her office, plaintiff verbally informed Dominic Ismert of her problems with Berg and that Berg had sexually harassed her. (SOF #45)

33. Plaintiff never informed Dominic Ismert that she did not want to move into Berg's old office. (SOF #41)

34. On October 8, 2001, plaintiff completed an EEOC intake questionnaire form. In the form, plaintiff complained that defendants had demoted her from the Human Resources Manager position to the Employee Advocate position in retaliation for her complaint of sexual harassment against Ron Berg. Plaintiff also complained that defendants retaliated against her by moving her to Ron Berg's office where most of the harassment had taken place. (PSOF #48)

6

35. Plaintiff was absent from work for FMLA-covered surgery from October 16 through 26, 2001. She returned to work on October 29, 2001. (PSOF #50)

36. In mid to late October 2001, Dominic Ismert made the decision to terminate plaintiff's employment based on the employee complaints he was continuing to receive, plaintiff's continued combative, antagonistic attitude towards him and others, and plaintiff's poor job performance. He opted, however, to continue plaintiff's employment through the holiday season. If plaintiff improved her performance and attitude, Dominic Ismert testified that he would have continued her employment. During this time period, Dominic Ismert intended to try and provide plaintiff feedback in order to improve her performance. (SOF #49 and #50)

    Plaintiff disputes that the decision to terminate her was made at this time. According to other testimony, Dominic Ismert made the decision to terminate plaintiff sometime after November 12, 2001. (See Plaintiff's Response citing to PSOF ## 44, 49, 51-57, 59, 62-63, 73, 75-79, 83, 85, 90)

37. Dominic Ismert did not advise plaintiff of his decision to terminate her employment or otherwise document the decision in any fashion. (SOF #51)

38. On November 9, 2001, Dominic Ismert sent plaintiff an e-mail and advised that she needed to improve her communications with him, the Human Resources Department and Sioux Chief employees. Dominic Ismert further advised plaintiff that he had yet to receive an update as to the progress of the *Chieftain Spirit*, the Company newsletter. (SOF #51)

39. Plaintiff responded to Dominic Ismert's e-mail on November 12, 2001, and requested that Dominic Ismert provide her with specific instances of her poor communications skills. Plaintiff further responded by raising issues of the Company's unfair treatment, harassment and discrimination against her. Plaintiff specifically stated, "If the objective of the Company is to make me mentally uncomfortable, discriminated and harassed, providing me a future rife with hostility, you are achieving the objectives." (SOF #53)

40. Dominic Ismert responded immediately to plaintiff's e-mail on November 12, 2001, and advised that while he did not have time to provide "specific feedback" at that particular time, he would do so at a later time. Dominic Ismert, however, advised plaintiff that she needed to improve her communication and relationships with Sioux Chief's employees. Dominic Ismert further responded by informing plaintiff that he did not intend to increase her stress. In response to Dominic Ismert's reply, plaintiff demanded "specific feedback." (SOF #54)

41. In regard to the different treatment related to FMLA leave, Sioux Chief advised plaintiff that she had failed to submit proper documentation with regard to her own

leave request; however, plaintiff believed she had submitted the proper documentation. Moreover, plaintiff believed that Sioux Chief permitted men to take leave without submitting any paperwork. (SOF #56)

42. Plaintiff referenced only Don Gooch ("Gooch"). Plaintiff testified that when Gooch had cancer and when he picked up his adopted daughter from China, he took leave without filling out any paperwork. At the time Gooch took a leave of absence for his cancer, plaintiff was the Human Resources Manager and was the person at the Company responsible for administering the FMLA paperwork. Gooch picked up his daughter from China prior to March 1998 when Pearman was the Human Resources Manager responsible for administering the FMLA paperwork. (SOF #57)

43. When questioned as to why she believed Dominic Ismert was manipulative because she was a woman, plaintiff responded that she was self-driven to improve and entrusted to work with other people and that Dominic Ismert told her that she needed to be a better interactor, team player and communicator. (SOF #58)

44. On November 12, 2001, Dominic and Joe Ismert met with plaintiff to discuss her allegations of harassment, discrimination and unfair treatment. Hitchner also attended this meeting. (SOF #59)

45. When questioned as to what was discussed in the November 12, 2001 meeting plaintiff testified only that Joe Ismert told her that she could not make inflammatory statements like that contained in her November 12, 2001 e-mail to Dominic Ismert, that if she continued to make inflammatory statements, she would be fired, that she had to retract her statements, and that if she failed to retract her statements she would be terminated. Plaintiff was unable to recall if Joe Ismert or Dominic Ismert discussed job performance issues with her. Plaintiff recanted her November 12, 2001 statements about harassment and discrimination, but only because she needed a job. (SOF #61)

    Plaintiff denies these statements. (PSOF #68 and #69)

46. After the November 12, 2001 meeting with plaintiff, Dominic Ismert requested Hitchner to document the meeting. No one took notes at the meeting. Hitchner's documentation states that Joe, Dominic and plaintiff discussed the following: (1) Dominic Ismert's management style; (2) Dominic Ismert's expectations for plaintiff; (3) Dominic Ismert's similar treatment of other employees; (4) plaintiff's failure to provide proper documentation relating to her FMLA leave; and (5) plaintiff's departure if she was unwilling to accept Dominic Ismert's management style. Hitchner also documented that plaintiff voluntarily recanted her claims of harassment and discrimination. (SOF #62)

    Plaintiff denies these statements. (PSOF #68, #69 and #72)

47. In late November 2001, plaintiff asked Mike Ismert to write a reference (not recommendation) letter for her. On November 27, 2001, Mike Ismert provided plaintiff a reference letter. Mike understood that plaintiff was searching for a new job. (SOF #64)

    Plaintiff denies this statement. (PSOF #36)

48. Upon receipt of Mike Ismert's letter, plaintiff informed Mike Ismert that she was being kept employed until after the holiday season. (SOF #65)

49. Dominic Ismert made the final decision to terminate plaintiff in mid-November 2001. At that point, Dominic Ismert was done trying to assist plaintiff in improving her performance. Dominic Ismert, however, opted to hold off plaintiff's termination until after the holiday season. (SOF #66)

    Plaintiff disputes this testimony. (See Plaintiff's Response citing to PSOF ## 44, 49, 51-57, 62, 63, 73-76, 78, 79, 83, 85, 90)(The Court notes that many of the paragraphs cited by plaintiff do not appear relevant to denying this allegation.)

50. Joe Ismert testified that he became aware of the decision to terminate plaintiff sometime after the November 12, 2001 meeting when Dominic Ismert told him basically, "I give up. She's gone." (PSOF #73)

51. On or about December 11, 2001, Sioux Chief received plaintiff's Charge of Discrimination alleging retaliation. Specifically, plaintiff alleged that she complained of Berg's harassment in May 2000 and that Sioux Chief thereafter demoted her to Employee Advocate one and one-half years later in September 2001. (SOF #67)

52. Sioux Chief terminated plaintiff's employment on January 7, 2002. (SOF #68)

53. Although Dominic made the decision to terminate plaintiff's employment, Mike Ismert, in the presence of Dominic Ismert, advised plaintiff of her termination. When questioned as to why he terminated plaintiff's employment instead of Dominic Ismert, Mike Ismert explained that he wanted to do it to show his support for Dominic Ismert and because he was the person who usually conducted Sioux Chief's terminations. (SOF #69)

54. On August 6, 2002, plaintiff requested a service letter from Sioux Chief pursuant to R.S.Mo. § 290.140. (SOF # 71)

55. Plaintiff sent a service letter request because "everyone was doing it and I wanted to see if they could tell me why they terminated me." (SOF #72)

9

56. On September 4, 2002, Sioux Chief issued a timely service letter in response to plaintiff's request. The service letter stated:

> This letter will serve as the service letter you requested. You were employed by Sioux Chief Manufacturing, Inc. from February 15, 1993 through January 7, 2002. As of January 7, 2002, you were working as the Employee Advocate responsible for managing employee relationships. Your employment with the Company ended on January 7, 2002, due to your continued poor performance.
>
> Please feel free to contact me if you have any questions.

(SOF #73)

57. Although he did not know what a service letter was, Joe Ismert signed it on behalf of defendants. According to Joe Ismert, the letter contained truthful information. (SOF #74)

58. Plaintiff's only claim is that defendants' service letter did not provide sufficient and specific information regarding the true reasons for the termination of plaintiff's employment, vaguely stating only that plaintiff was terminated "due to continued poor performance." (SOF #75)

59. Plaintiff disputes that Sioux Chief fired her because of her continued poor performance. (SOF #76)

60. Plaintiff never showed any prospective employer the service letter she received from Sioux Chief. Likewise, no prospective employer ever asked plaintiff to provide a copy of Sioux Chief's service letter. (SOF #77)

61. Plaintiff's job search was in no way affected by the contents of Sioux Chief's service letter. (SOF #78)

### III. DISCUSSION

A. Retaliatory Discharge

Plaintiff claims defendants unlawfully retaliated against her by terminating her on January 7, 2002. Plaintiff contends she was terminated for expressing her belief that the company was making her "mentally uncomfortable, discriminated and harassed" and by filing a charge of discrimination with the EEOC alleging retaliation. The parties differ over whether the case should

10

be analyzed under the mixed-motive analysis of Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), or under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Plaintiff contends that the mixed-motive analysis is applicable here.

However, as pointed out by defendants, following the Desert Palace decision, the Eighth Circuit has "continued to apply the burden shifting framework established in McDonnell Douglas to determine whether or not a claim of unlawful employment discrimination can survive a motion for summary judgment." Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1018 (8th Cir. 2005). See also Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1078 (8th Cir. 2005).

Under this framework, a Title VII[1] plaintiff has the initial burden of establishing a prima facie case of retaliatory discrimination. See Hill v. St. Louis Univ., 123 F.3d 1114, 1119 (8th Cir. 1997). To establish a prima facie case of retaliatory discrimination, a plaintiff must show: (1) she engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action. See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.)(en banc), cert. denied, 528 U.S. 818 (1999).

Once the plaintiff is successful in establishing a prima facie case, a rebuttable presumption of discrimination arises. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action. See Buettner v. Arch Coal Sales Co., 216 F.3d 707, 714 (8th Cir. 2000), cert. denied, 531 U.S. 1077 (2001). If the employer carries this burden, the legal presumption of unlawful discrimination "drops out of the picture." Ryther v.

---

[1] Plaintiff's retaliation claim under the MHRA is analyzed in the same manner as her Title VII claim. See Weyers v. Lear Operations Corp., 359 F.3d 1049, 1056 n.6 (8th Cir. 2004).

11

KARE 11, 108 F.3d 832, 836 (8th Cir.), cert. denied, 521 U.S. 1119 (1997). To prevail, the plaintiff must offer evidence of pretext and disbelief of the employer's explanation. The plaintiff must show "both that the reason was false and that discrimination was the real reason." Id. at 838 n.5.

While the Court has determined that the burden shifting approach provides the proper framework for analyzing the issue, the Eighth Circuit has found that the McDonnell Douglas methodology is in principle consistent with the mixed-motive analysis of Desert Palace:

> we have long recognized that a genuine issue of fact regarding unlawful employment discrimination may exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason for the adverse employment action.

Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1017-18 (8th Cir. 2005).

Defendants acknowledge that plaintiff's termination constitutes an adverse employment action sufficient for the second prong of plaintiff's prima facie case. Defendants, however, dispute that plaintiff can satisfy the first and third prongs of her prima facie case.

        1.      Protected Activity

As to the first prong of a prima facie case of retaliatory discharge, Title VII's retaliation provision "protects activities ranging from filing a complaint to expressing a belief that the employer has engaged in discriminatory practices." Buettner v. Arch Coal Sales Co., 216 F.3d 707, 714 (8th Cir. 2000), cert. denied, 531 U.S. 1077 (2001). While a plaintiff is not required to establish the conduct she opposed was in fact discriminatory, she must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law. Id. In this case, plaintiff alleges she engaged in two separate protected activities. Defendant argues that neither of the activities in which plaintiff engaged are protected because plaintiff's charges are "phony" and she acted in bad faith.

Plaintiff's first alleged protected activity was an internal complaint of discrimination on

12

November 12, 2001. In that communication, plaintiff complained to Dominic Ismert via e-mail that "if the objective of the Company is to make me mentally uncomfortable, discriminated and harassed, providing me a future rife with hostility, you are achieving the objectives in full." (See Fact No. 39, supra) Defendants contend that the complaint, which was made three days after she was told by Dominic Ismert to improve her performance and communications skills, was a sham and was made in an effort to thwart plans to fire her. Defendants further advise that plaintiff later recanted the complaint, thus proving that the complaint was baseless.

The problem with defendants' argument is that while plaintiff was aware that Dominic Ismert was unhappy with her performance and communication skills, she was never told that her job was in danger. Dominic Ismert claims he made the decision to fire plaintiff in October of 2001, however, he did not advise anyone of his decision, including plaintiff. Plaintiff had already initiated the EEOC charge process by completing an intake questionnaire on October 8, 2001. In fact, plaintiff believed that she was being discriminated against with regard to how her FMLA leave was handled differently than that of a male employee and how her job performance was being evaluated. Finally, defendants' contention that plaintiff's recantation of the complaint proves that it was baseless is belied by plaintiff's testimony that she felt she would be terminated if she did not recant it.

Plaintiff's second alleged protected activity occurred when she filed her formal charge of retaliation which was received by the defendants on December 11, 2001. The retaliation charge was based upon her being transferred to the Employee Advocate position following her allegations of discrimination against Ron Berg who had recently been terminated from Sioux Chief. Defendants contend that the EEOC charge was filed in bad faith and as a last ditch effort to save her job. Once again, plaintiff began the EEOC process by completing an intake questionnaire on October 8, 2001,

13

shortly after her reassignment from Human Resources Manager to Employee Advocate. Plaintiff included information regarding her claim of retaliation in the intake questionnaire. In evaluating a defendant's summary judgment motion, all inferences must be viewed in a light most favorable to the plaintiff, the non-moving party. Thus, the Court cannot assume, as defendants suggest, that the timing of the filing of the formal charge of retaliatory discrimination was merely a last ditch effort by plaintiff to save her job.

Therefore, both the e-mail communication to Dominic Ismert, wherein plaintiff complained of discrimination and harassment, and the EEOC charge of retaliation were protected activities. Plaintiff has satisfied the first prong of her prima facie case.

### 2. Causal Connection

As to the third prong of a prima facie case of retaliatory discharge, plaintiff must show a causal connection between plaintiff's protected activities and her termination. "A causal connection implies not just a relationship between two events, but a certain type of relationship in which one event is generated by the other." Zhuang v. Datacard Corp., 414 F.3d 849, 856 (8th Cir. 2005). Defendants argue that plaintiff cannot show a causal connection between her protected activities and her termination because the two events occurred too remote in time to infer a link between the two. Defendants also contend that Dominic Ismert's decision to terminate plaintiff occurred prior to plaintiff's protected activities and, therefore, undercuts the significance of any possible temporal proximity.

It is clear that "[m]ore than a temporal connection is generally required to present a genuine factual issue of retaliation," Zhuang, 414 F.3d at 856, although the timing of an adverse action can be close enough to the protected activity to establish causation in a prima facie case. See Peterson

14

v. Scott County, 406 F.3d 515, 525 (8th Cir. 2005). In this case, there is more than just closeness in time to show a causal connection. Immediately after receiving plaintiff's e-mail, Dominic Ismert and Joe Ismert confronted plaintiff about the allegations. At that meeting, plaintiff was pressed by the Ismerts into recanting her allegations. Plaintiff alleges that she recanted the allegations because she felt she would be terminated if she did not.[2] Some time after the meeting, Dominic Ismert advised Joe Ismert that he was going to terminate plaintiff after the holiday season.

Plaintiff was not terminated until January 7, 2002, two months after the November e-mail and one month after defendants received her EEOC charge of discrimination. There is evidence, however, that the decision to terminate her was made only a few weeks after the November e-mail. The date of the decision to terminate plaintiff is relevant here, not the actual date of termination. Defendants argue that plaintiff was terminated two months after the protected activity which renders it too remote in time to be of significance, yet at the same time also argue that the decision to terminate plaintiff was made much earlier.

In fact, defendants contend that the initial decision to terminate plaintiff was made by Dominic Ismert sometime before plaintiff's protected activity. This, they argue, undercuts a causal connection between the protected activity and plaintiff's termination. The problem with defendants' argument is that defendants have no evidence that Dominic Ismert made the decision to terminate plaintiff prior to the protected activity other than Dominic Ismert's own testimony. The lack of other evidence renders this a credibility issue which the Court cannot consider. See Quick v. Donaldson Co., 90 F.3d 1372, 1376-77 (8th Cir.1996). Further, Ismert testified that if plaintiff improved her

---

[2]A factual dispute has been presented as to whether plaintiff voluntarily retracted her allegations of discrimination at the meeting or whether she retracted her allegations because she needed a job and was threatened with immediate termination if she did not recant.

15

performance and attitude, he would have continued her employment. (See Fact No. 36, supra) Thus, there is evidence that even if the decision was made prior to the protected activity, the decision was not final at that time and did not become final until after plaintiff engaged in her protected activity.

In these circumstances, the date the decision was made to terminate plaintiff is a fact question that must be resolved by a jury. The date the jury determines the decision was made may affect what the jury determines was the motivating factor behind the decision. For example, a jury may determine that it does not believe plaintiff's conduct in October of 2001 was the true reason for her discharge in January of 2002.

The timing of the decision and the defendants' reaction to plaintiff's allegations of discrimination and harassment are sufficient to show a causal connection existed between the two events. See Smith v. Riceland Foods, Inc., 151 F.3d 813, 819 n.5 (8th Cir. 1998)(holding that plaintiff's termination was causally connected to filing of discrimination charge where termination occurred approximately two months after charge was filed and employee presented evidence that management confronted her about filing of charge). Plaintiff has satisfied the third prong of her prima facie case.

### 3. Presumptions

Plaintiff has established a prima facie case and, therefore, a rebuttable presumption of discrimination arises. The burden then shifts to the defendants, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Defendants allege that plaintiff was terminated based upon Dominic Ismert's observations of plaintiff's behavior and insubordination, including the shredding incident, complaints from Hitchner and Wolfe that plaintiff was being

16

combative and not communicating with them regarding her time off for medical leave, and plaintiff's poor performance.

Defendants have articulated a legitimate, nondiscriminatory reason for the employment action. Plaintiff must offer evidence of pretext and disbelief of the employer's explanation. Plaintiff contends that there is evidence in the record that the decision to terminate her employment was in retaliation for her complaints of discrimination. In fact, the timing of the decision to terminate her following her protective activity and management's confrontation with her regarding her complaints of harassment and discrimination may infer a discriminatory motive on defendants' part. In <u>Strate v. Midwest Bankcentre, Inc.</u>, 398 F.3d 1011, 1018 (8th Cir. 2005), the Eighth Circuit cited with approval its earlier statement in <u>Davenport v. Riverview Gardens School District</u>, 30 F.3d 940, 945 n.8. (8th Cir. 1994), that the standard for a plaintiff to survive summary judgment requires only that the plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence does not directly contradict or disprove the defendant's articulated reasons for its action. Plaintiff Ross has offered sufficient evidence to create factual issues for resolution by a jury and to raise genuine doubt as the legitimacy of defendants' motives. Accordingly, Defendants' Motion for Summary Judgment on this claim must be denied.

B.   <u>Missouri Service Letter Statute</u>

Pursuant to R.S.Mo. § 290.140, an employee who is discharged from employment may request a letter from the employer "setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and truly stating for what cause, if any, such employee was discharged ..." An employee who requests a service letter from the employer has a cause of action against the employer if it fails to issue the letter or issues a letter which does not

17

conform to all of the statutory requirements. See Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1132 (8th Cir. 2001), citing Labrier v. Anheuser Ford, Inc., 621 S.W.2d 51, 56 (Mo. 1981)(en banc). The failure to state a cause for discharge or supply any other required information constitutes a refusal to issue a service letter and entitles an employee to nominal damages without proof of actual damages. See Herberholt v. dePaul Community Health Ctr., 625 S.W.2d 617, 622 (Mo. 1981)(en banc)(per curiam); Ball v. American Greetings Corp., 752 S.W.2d 814, 821 (Mo. Ct. App. 1988). Missouri law also provides for punitive damages when the employer does not issue the requested letter and the employee proves the presence of malice. See Callantine, 271 F.3d at 1132; Ruzicka v. Hart Printing Co., 21 S.W.3d 67, 76 (Mo. Ct. App. 2000).

In response to plaintiff's request for a service letter, defendants provided the following timely response:

> This letter will serve as the service letter you requested. You were employed by Sioux Chief Manufacturing, Inc. from February 15, 1993 through January 7, 2002. As of January 7, 2002, you were working as the Employee Advocate responsible for managing employee relationships. Your employment with the Company ended on January 7, 2002, due to your continued poor performance.

(See Fact No. 56, supra)

Plaintiff admits that she did not show the service letter to any prospective employers, was never asked to provide a copy of the service letter to any prospective employer and her job search was in no way affected by the contents of the letter. Therefore, plaintiff concedes she cannot make a submissible case to recover compensatory damages. (See Plaintiff's Suggestions in Opposition to Defendants' Motion for Summary Judgment (doc. #49) at 29) Plaintiff argues, however, that the stated reason for plaintiff's termination from employment is too vague to state a cause for discharge under the statute. Thus, the letter fails to state a cause and constitutes a refusal to issue a service

letter entitling plaintiff to nominal and punitive damages.

In <u>Stark v. American Bakeries Co.</u>, 647 S.W.2d 119, 122-23 (Mo.1983)(en banc), the Court held that the statement in a service letter: "[y]ou were terminated on March 13, 1976 because your work was unsatisfactory" was too vague to sufficiently state a cause for termination under the service letter statute. The purpose of the statue is to "deter corporate employers from destroying or severely impairing the employability of former employees by furnishing false or misleading information as to their service or false reasons for their discharge." <u>Id.</u> at 123 (citing <u>Cheek v. Prudential Ins. Co.</u>, 192 S.W. 387, 389 (Mo. 1916)). By having the correct information regarding their previous employment, employees should be able to counter false information or use the true cause of their termination to sue for wrongful discharge in appropriate cases. <u>Id</u>. The <u>Stark</u> court found that the stated reason was too vague to achieve these goals because although the plaintiff's work may have been unsatisfactory in some respects, he was unable to rebut allegations that his work was unsatisfactory in all respects. <u>Id</u>.

The Court concludes that the statement that plaintiff Ross was terminated for "continued poor performance" is indistinguishable from the explanation provided in <u>Stark</u> that termination was because "your work was unsatisfactory." Neither explanation would allow the terminated party "to meet and rebut severely impairing 'facts' stated by his former corporate employer." <u>Stark</u>, 647 S.W.2d at 123.

Thus, plaintiff Ross may maintain a cause of action for nominal damages. However, in order to recover punitive damages, plaintiff must show malice on the part of defendants. "The test to be applied in determining if malice existed as a basis for an award of punitive damages is whether the defendant did a wrongful act intentionally without just cause or excuse." <u>Stark</u>, 647 S.W.2d at 123.

19

The defendant must have intended to perform the act and must have known it was wrongful when he did it. Id. Plaintiff argues that her evidence of retaliation is sufficient to establish the requisite level of malice. The Court has concluded that factual issues preclude summary judgment in favor of defendants on the retaliation claim. Those same factual issues preclude any resolution of the punitive damage issue prior to trial.

## IV. CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendants' Motion for Summary Judgment (doc. #44) is denied as to Counts 1 and 3 of the Complaint. It is further

ORDERED that Count 2 of the Complaint is dismissed because plaintiff has indicated an intent to abandon the claims asserted in this Count of her Complaint.

> */s/ Sarah W. Hays*
> SARAH W. HAYS
> UNITED STATES MAGISTRATE JUDGE

20